THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
FRANK D. KORTUM
Assistant United States Attorney
Asset Forfeiture Section
California Bar No. 110984
     United States Courthouse
     312 North Spring Street, Suite 1400
     Los Angeles, California 90012
     Telephone: (213)894-5710
     Facsimile: (213)894-7177
     E-Mail:   Frank.Kortum@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>REAL PROPERTY LOCATED IN ORANGE, CALIFORNIA,<br><br>       Defendant.<br>_____<br>ELIZABETH LARA, et al.,<br><br>       Claimants.<br>_____<br>AND CONSOLIDATED ACTIONS<br><br>_____ | NO.  CV 06-6758-R (PLAx)[AND THE FOLLOWING CONSOLIDATED ACTIONS: United States v. $15,781.76 in U.S. Currency, et al. CV 07-1962 FMC (PLAx); and United States v. Real Property Located in Orange, California, CV 06-6759 FMC (PLAx)]<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW<br><br>Date: February 8, 2010<br>Time: 10:00 a.m.<br>Before the Honorable Manuel L. Real, United States District Judge<br><br>Trial: None Set |

///

///

///

**FINDINGS OF FACT**

1.    Plaintiff United States of America ("plaintiff" or "the government") initiated this action on October 4, 2006 by filing a complaint for Forfeiture alleging that the defendant property was used or intended to be used to commit or to facilitate the commission of one or more violations of 21 U.S.C. § 841 and is, therefore, subject to forfeiture under 21 U.S.C. § 881(a)(7).

2.    Plaintiff moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the ground that the undisputed facts demonstrate that the defendant property is subject to forfeiture under 21 U.S.C. § 881 (a)(7) as a matter of law.

3.    This is a civil <u>in rem</u> forfeiture action pursuant to 21 U.S.C. § 881(7).  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1345 and 1355.  Venue lies in this district pursuant to 28 U.S.C. §§ 1355(b) and 1395.

4.    The defendant real property (the "defendant property") is located in Orange, California.  Verified Complaint ¶ 5.

5.    Juan Contreras ("Contreras") and Mauricio Cortez ("Cortez") operated a narcotics trafficking organization from their residences in Orange, California, one of which is the defendant property.  The two residences are next to each another and Cortez and Contreras used them as central distribution centers for narcotics trafficking.  Contreras and Cortez worked both independently and together, providing each other with narcotics and supporting the other's activities.  Verified Complaint ¶ 6.

6.    In 2005 and 2006, Cortez, Contreras, and others,

2

including Lourdes Contreras ("Lourdes"), Contreras's wife, conducted narcotics transactions at these two residences.  During the investigation, controlled purchases were made at each of the residences.  Further, federal agents monitoring Cortez's and Contreras's telephones intercepted numerous narcotics trafficking related calls that were made from and/or received at the residences.  Verified Complaint ¶ 7.

7.  During the course of the investigation, Orange Police Department ("OPD") identified a confidential source ("CS-1") who stated that he ws acquainted with Contreras and had been approached by Contreras to purchase and/or sell pound quantities of methamphetamine.  Verified Complaint ¶ 8.

8.  On June 16, 2005, CS-1 notified OPD that Contreras had approximately five pounds of crystal methamphetamine at the defendant property.  CS-1 made a monitored telephone call to Contreras.  CS-1 asked Contreras if he had the product. Contreras replied that he did and the price would be $3,700.  CS-1 agreed with the price and told Contreras that he/she would be arriving shortly.  Verified Complaint ¶ 9.

9.  OPD provided CS-1 with an audio surveillance device and $3,700 for the purchase of the methamphetamine from Contreras. OPD established surveillance on the defendant property and watched CS-1 ride a bike to the residence. Verified Complaint ¶ 10.

10.  During the meeting, CS-1 and Contreras spoke in Spanish.  CS-1 gave Contreras the $3,700, which Contreras counted and placed in $500 stacks.  Contreras went into a bedroom toward the rear of the house and returned several minutes later with a

1   large plastic baggie containing methamphetamine.  Contreras asked

2   CS-1 if it looked alright.  CS-1 confirmed that he/she was

3   satisfied with the quantity and quality.  CS-1 took the product

4   and left the defendant property.  Verified Complaint ¶ 11.

5       11.  CS-1 rode his/her bicycle to the designated meeting

6   spot and, once inside the undercover car, handed investigators

7   the backpack.  Officers removed a clear freezer style baggie with

8   a crystal substance inside.  At OPD, the substance tested

9   positive for methamphetamine.  Verified Complaint ¶ 12.

10      12.  On April 12, 2006, officers interviewed Wendy Ruiz

11  following her arrest on April 9, 2006, for possession of

12  methamphetamine.  Ruiz stated that she had been buying drugs from

13  Contreras on an almost daily basis for the last two years.  She

14  usually bought crystal methamphetamine or cocaine; on one

15  occasion she purchased heroin.  Ruiz most often bought crystal

16  methamphetamine in either eight ball or ounce quantities,

17  although in the past she had bought up to 1/2 pound quantities.

18  Ruiz last purchased drugs from Contreras on April 10, 2006.

19  Verified Complaint ¶ 20.

20      13.  In addition to buying drugs from Contreras, Ruiz also

21  bought drugs from Juan's wife, Lourdes Contreras, when Juan was

22  away in Mexico.  Verified Complaint ¶ 21.

23      14.  Ruiz knew of two places in Contreras's house, i.e., the

24  defendant property, where he stored drugs.  One place was in

25  Contreras' closet where he kept his shoes; the other space was a

26  cut-out about the size of a shoe box in the stucco between the

27  laundry room door and the side of the house.  She had heard

28  Contreras talk about the locations, and she had also seen the

4

hiding space in the backyard.  Verified Complaint ¶ 22.

15.  On June 21, 2006, at approximately 9:00 a.m., members of the Drug Enforcement Administration ("DEA"), assisted by OPD detectives, established surveillance at the defendant property. At approximately 11:30 a.m., intercepted calls to Contreras's phone indicated that an unidentified male was coming over to the defendant property to meet with Contreras for a possible drug deal.  Verified Complaint ¶ 23.

16.  At approximately 1:40 p.m., investigators saw a green compact vehicle, later identified as a Nissan Sentra registered to Rafael Sanchez Gomez of Fresno, California, approach the defendant property.  Contreras motioned for the Nissan to enter the driveway to a point where it was out of officers' visual contact.  Verified Complaint ¶ 24.

17.  At approximately 1:53 p.m., the Nissan Sentra left the defendant property and traveled north on Batavia Street. Surveillance officers saw the driver looking in his rearview mirror as the front passenger appeared to be looking down toward the floor of the vehicle.  Investigators also saw Contreras looking in the direction of the Nissan Sentra.  Verified Complaint ¶ 25.

18.  Agents asked OPD to conduct a traffic stop on the Nissan Sentra.  An OPD officer saw that the passenger of the vehicle was not wearing his seatbelt and, at approximately 2:00 p.m., stopped the Nissan Sentra in Santa Ana, California. Verified Complaint ¶ 26.

19.  The OPD officer discovered that the driver of the Nissan Sentra was unlicensed.  An inventory search of the Nissan

5

1   Sentra was conducted in anticipation of towing the vehicle, but
2   no illegal contraband was found.  The occupants of the Nissan
3   Sentra also had no illegal contraband on their persons.  Verified
4   Complaint ¶ 27.

5       20.  OPD released the driver on a citation for driving
6   without a license, and the passenger was released with a verbal
7   warning regarding the seat belt violation.  Thereafter, the
8   Nissan Sentra was towed to American All Star Towing, Orange,
9   California.  Verified Complaint ¶ 28.

10      21.  Later on June 21, 2006, Contreras received calls from
11  an individual believed to be the driver of the Nissan Sentra,
12  which indicated that drugs were hidden somewhere in the vehicle.
13  Verified Complaint ¶ 29.

14      22.  On June 22, 2006, agents obtained a federal search
15  warrant for the Nissan Sentra.  During the search, detectives
16  discovered hidden compartments in both the driver and passenger
17  floorboards of the vehicle.  From the passenger side floorboard,
18  agents recovered two large zip-lock bags of a clear crystal
19  substance, and one smaller zip-lock bag containing multiple
20  individually-wrapped circular shaped clear substances.  One of
21  the substances, which looked different than the others,
22  subsequently tested positive for cocaine.  Also from the
23  passenger side floorboard, agents recovered approximately $10,500
24  U.S. currency.  The money was separated into small stacks bound
25  by rubber bands and was located inside a black plastic bag.
26  Verified Complaint ¶ 30.

27      23.  On June 23, 2006, at approximately 12:54 p.m.,
28  Contreras received a telephone call from "Felipe."  Speaking in

6

coded language, Felipe asked Contreras how he was doing on
windows.  Contreras responded that they were there.  Felipe asked
if it was the same job and Contreras responded, "yes."  Contreras
informed Felipe the ones that arrived were pretty.  Felipe told
Contreras to set aside four windows and one bedroom, and that he
would be at Contreras's house in an hour.  Contreras told Felipe
that he was going out so he would take them to him; Contreras
would call Felipe to decide where they could meet.  Verified
Complaint ¶ 31.

24.  On June 23, 2006, at approximately 1:50 p.m., law
enforcement established surveillance at the defendant property.
Verified Complaint ¶ 32.

25.  At approximately 3:37 p.m., Felipe called Contreras and
the two continued to make arrangements for the narcotics
transaction.  Contreras suggested that he could send his nephew
over to meet Felipe as his location.  Felipe agreed, and
Contreras said his nephew would be over in a little bit.  Felipe
acknowledged.  Verified Complaint ¶ 33.

26.  At approximately 3:55 p.m., investigators saw a grey
Chevrolet Tahoe, registered to Melquiades M. Paez or Maria Milano
of Anaheim, California, leave the defendant property.  The Tahoe
was occupied by two males, later identified as Uriel Hernandez
and Hector Euriquez Zaragoza.  Verified Complaint ¶ 34.

27.  Agents followed the Tahoe through the City of Orange
into the City of Anaheim.  At DEA's request, the Anaheim Police
Department conducted a traffic stop of the vehicle.  Hernandez
and Zaragoza consented to a search of the Tahoe, whereupon
officers found 121.9 grams of methamphetamine and $21,100 U.S.

7

1   currency hidden in the center console. Verified Complaint ¶ 35.

2       28.  Hernandez and Zaragoza were arrested for possession of

3   methamphetamine for sale and transportation and were transported

4   to the City of Anaheim jail. Verified Complaint ¶ 36.

5       29.  At 4:25 p.m., Felipe called Contreras and Contreras

6   told Felipe to go outside his house because Contreras's nephew

7   was around there.  Felipe asked what type of car his nephew was

8   driving, and Contreras said that he was driving the Tahoe and

9   that Contreras thought he was out there now.  Felipe said that he

10  would check. Verified Complaint ¶ 37.

11      30.  At 4:38 p.m., Felipe called Contreras.  Contreras asked

12  if his nephew had gotten there yet, and Felipe replied no.

13  Contreras said he would phone his nephew and call Felipe back.

14  Felipe asked if Contreras had another phone number for his

15  nephew; Contreras said no, he would call his nephew at that

16  number, and Felipe should wait. Verified Complaint ¶ 38.

17      31.  At 4:49 p.m., Contreras called Felipe and told Felipe

18  that the authorities had stopped his nephew, but Contreras didn't

19  know where. Verified Complaint ¶ 39.

20      32.  At 6:59 p.m., Felipe called Contreras.  Contreras said

21  that there were problems, that the authorities pulled Contreras's

22  nephew over, and he did not know what was going on.  Contreras

23  asked Felipe what he thought, adding that the worst thing was

24  that Contreras's nephew was driving Contreras's Tahoe. Verified

25  Complaint ¶ 40.

26      33.  During the course of the investigation, multiple wire

27  intercepts revealed that Contreras and Cortez were conducting

28  their narcotics trafficking businesses from their residences on a

8

daily basis, both together and independently.  Specifically,
during the period May 2 to June 29, 2006, Cortez was intercepted
on approximately 50 telephone calls discussing narcotics
trafficking activities in code, and during the period June 14 to
July 11, 2006, Contreras was intercepted on approximately 86
telephone calls discussing narcotics trafficking activities in
code. Verified Complaint ¶ 41.

34.   DEA and local agencies spent many hours on surveillance
of Cortez, Contreras, and their residences.  During surveillance,
investigators have identified "look-outs" on foot and bicycle
from both residences, watching for law enforcement.  In addition,
when driving, Cortez and Contreras practice counter-surveillance
tactics, including u-turns, sudden lane changes, and constant
checks in the rearview mirror, making it difficult for law
enforcement to follow them.  Verified Complaint ¶ 42.

35.   Before June 23, 2006, neither Cortez nor Contreras was
ever seen going to any type of regular, legitimate employment.
Sometime after June 23, 2006, Contreras decided he should get a
job until things cooled off.  Verified Complaint ¶ 43.

36.   In 2007, Contreras pleaded guilty to distributing
controlled substances in violation of 21 U.S.C. § 843.  <u>See</u> Exh.
"B".  In connection with his guilty plea he admitted that he had
used his house to facilitate the narcotics transactions.  <u>Id.</u> at
p. 6-7.

37.   On February 25, 2009, the government requested that
Contreras

•   Admit that the defendant property was used or intended
    to be used to commit, or to facilitate the commission

9

1    of, a violation of 21 U.S.C. § 841.

2    •    Admit that he conducted a narcotics transaction at his

3         residence on June 16, 2005, for which he received

4         $3,700 in exchange for a large plastic baggie

5         containing methamphetamine.

6    •    Admit that he sold crystal methamphetamine, cocaine, or

7         heroin to Wendy Ruiz on a regular basis for nearly two

8         years;

9    •    Admit that he stored controlled substances within the

10        defendant property.

11   Plaintiff's Motion to Compel (Docket No. 22) at p. 19-21.  On May

12   27, 2009, in response to the government's motion to compel

13   Contreras to respond to these requests for admissions as well as

14   other discovery requests, the Magistrate Judge assigned to this

15   case ordered, <u>inter alia</u>, that the requests for admissions quoted

16   above would be deemed admitted unless Contreras moved to withdraw

17   them by June 26, 2009.  Order re Plaintiff's Motion to Compel

18   (Docket No. 25) at 2-3.  Claimant failed to comply with any of

19   the provisions of the May 27 order.

20                        <u>**CONCLUSIONS OF LAW**</u>

21        38.  Summary judgment is appropriate when there are no

22   genuine issues of material facts in dispute and the moving party

23   is entitled to judgment as a matter of law.  <u>See</u> Fed.R.Civ.P.

24   56(c). In deciding a motion for summary judgment, the court must

25   view the facts in the light in the light most favorable to the

26   moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>,

27   475 U.S. 574, 587 (1986).  However, the non-movant bears the

28   burden of producing proof of the existence of the elements

                                10

essential to its case, which it would have to prove at trial.
<u>Celotex Corp. v. Caterett</u>, 477 U.S. 317, 322 (1986).  If no
rational fact-finder could find in the non-movant's favor, there
is no genuine issue of material fact and summary judgment is
appropriate.   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-
252 (1986); <u>Matsushita Elec.</u>, 475 U.S. at 587.  The court is not
"to weigh the evidence and determine the truth of the matter but
to determine whether there is a genuine issue for trial."
<u>Anderson</u>, 477 U.S. at 249.  A genuine issue for trial exists when
there is sufficient "evidence on which a jury could reasonably
find for the [claimant]."

     39.   In a suit or action brought under "any civil forfeiture
statute" for the civil forfeiture of any property, "the burden of
proof is on the Government to establish, by a preponderance of
the evidence, that the property is subject to forfeiture . . ."
18 U.S.C. § 983(c)(1); <u>see</u> <u>also</u> <u>United States v. $557,933.89</u>, 287
F.3d 66, 76 n.5 (2d Cir. 2002) (outlining previous burden-
shifting framework under which the government first had to
establish probable cause that an asset was subject to forfeiture
and the claimant bore the burden of rebutting that showing).  To
satisfy its burden, the government may use evidence "gathered
after the filing of the complaint for forfeiture to establish, by
a preponderance of the evidence, that property is subject to
forfeiture . . . ."  18 U.S.C. § 983(c)(2).

     40.   The undisputed facts show that the defendant property
was used or intended to be used to commit, or to facilitate the
commission of, multiple violations of 21 U.S.C. § 841 and is,
therefore, subject to forfeiture pursuant to 21 U.S.C. §

1    881(a)(7).  <u>See</u> (in particular) Claimant's guilty plea (paragraph

2    36, <u>supra</u>), and the Magistrate Court's order that government's

3    requests for admission  would be deemed admitted unless claimant

4    moved to withdraw them (paragraph 37, <u>supra</u>).

5         41.  To the extend that any findings of fact contained

6    herein can be considered to be or are deemed to be conclusions of

7    law, they are incorporated by reference into the Conclusions of

8    Law.  To the extent that any conclusions of law contained herein

9    can be considered to be or are deemed to be findings of fact,

10   they are incorporated by reference into the Findings of Fact.

11                         <u>**CONCLUSION**</u>

12        For the foregoing reasons, this Court hereby enters summary

13   judgment in favor of the United States.

14        **IT IS SO ORDERED**

15   DATED: February 9, 2010

16

17                          _____
                                 THE HON. MANUEL L. REAL
                            UNITED STATES DISTRICT JUDGE

18

19   PRESENTED BY:

20   THOMAS P. O'BRIEN
     United States Attorney
21   CHRISTINE C. EWELL
     Assistant United States Attorney
22   Chief, Criminal Division
     STEVEN R. WELK
23   Assistant United States Attorney
     Chief, Asset Forfeiture Section

24

25   _____
     FRANK D. KORTUM
26   Assistant United States Attorney

27   Attorneys for Plaintiff
     United States of America
28

                             12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

13